UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SARA COLEMAN, as Personal Representative of
the ESTATE OF THEODORE COLEMAN, JON
MCCOLLUM, and ROLAND STEPHENS,
individually and on behalf of a class of all others
similarly situated,

     Named Plaintiffs,

  -against-

THE CITY OF NEW YORK,
NEW YORK CITY POLICE DEPARTMENT
("NYPD") DEPUTY COMMISSIONER DAVID
COHEN, and NYPD ASSISTANT CHIEF
THOMAS GALATI,

     Defendants.

**CLASS ACTION COMPLAINT
JURY DEMAND**

Sara Coleman, as Personal Representative of the Estate of Theodore Coleman, Jon

McCollum, and Roland Stephens (collectively, "Named Plaintiffs") individually and on behalf of

a class of all others similarly situated, for their Complaint against Defendants City of New York,

NYPD Deputy Commissioner David Cohen, and NYPD Assistant Chief Thomas Galati

(collectively, "Defendants"), allege as follows:

## INTRODUCTION

   1.  This class action seeks to vindicate the rights of the many African-

American detectives in the NYPD's Intelligence Division[1] whose promotions were denied or

delayed solely based on race. For well over a decade, the NYPD's Intelligence Division has

implemented a secretive and unstructured promotions policy, administered by white supervisors

---

[1] In 2013, the Intelligence Division changed its name to the Intelligence Bureau. For ease of
reference, the Bureau will be referred to throughout this complaint as "Intelligence Division."

who refuse to promote deserving African-Americans detectives. As a result of these policies, Named Plaintiffs and other African-American detectives have been repeatedly denied well-deserved promotions—even when recommended by their direct supervisors—without explanation, while less qualified white detectives have been promoted above them.

     2.     Detectives Theodore Coleman, Jon McCollum and Roland Stephens were each highly experienced African-American detectives, who devoted over twenty years of their careers to law enforcement. Over the course of their careers in the NYPD, they were each repeatedly commended for their investigative successes, leadership, professionalism, and devotion to achieving the finest results.

     3.     In 2001, all three of them joined the NYPD's elite Intelligence Division, which is tasked with preventing and investigating terrorism and other major crimes. On September 11, 2001, they risked their lives to rescue those in the towers and to maintain security. Following the attacks, they assisted with the cleanup and investigation, interviewing hundreds of suspected terrorists and following up on innumerable leads. They dedicated their careers to keeping New Yorkers safe.

     4.     In spite of their proven track records of achievement and strong recommendations from their direct supervisors, they were repeatedly passed up for promotion due to their race. More than one supervisor who recommended them said that if they had been white then they would have been promoted. Other supervisors were at a loss to explain why they were not promoted.

     5.     Other African-Americans detectives in the Intelligence Division have faced a similar fate. There is a stark disparity in the percent of African Americans in the Intelligence Division, as opposed to the police force in general. When Named Plaintiffs filed

with the United States Equal Employment Opportunity Commission ("EEOC") a complaint in 2011, African Americans constituted 18% of all NYPD police officers and 16% of all detectives, but only 6% of Intelligence Division personnel and 7% of Intelligence Division detectives.

6.      Of the African-American detectives in the Intelligence Division, the vast majority were of the lowest grade, Third Grade Detectives. Third Grade Detectives make approximately $20,000 less per year than Second Grade Detectives and approximately $30,000 per year less than First Grade Detectives.

7.      The disproportionately small number of African-American detectives in the higher paying and more prestigious First and Second Grades is a direct result of the secret and standard-less promotions policy that gives high-level NYPD personnel in the Intelligence Division unchecked discretion to hand-pick white candidates for promotion while repeatedly overlooking more qualified African-American detectives. At the time Named Plaintiffs filed their charge with the EEOC, those making the decisions were overwhelmingly white. There were no African Americans in the senior levels of the Intelligence Division, with none holding a rank above sergeant—that is, no Lieutenants, Captains, Deputy Inspectors, or Chiefs.

8.      After investigating the case for five years, the EEOC found that "black detectives do not receive equal treatment in promotion." Specifically, the EEOC found that Named Plaintiffs "and black detectives in general, received lesser and later opportunities for promotion consistent with their qualifications." That is, African-American detectives waited years longer than their white counterparts to be promoted.

9.      Although Named Plaintiffs have complained for years about this discriminatory treatment and brought an EEOC charge, which was determined in their favor, the NYPD has yet to address these concerns and has failed to take even the basic step of adopting

and implementing a formal, non-discriminatory promotions policy with clear criteria for promotion. As a result, African-American detectives continue to face the NYPD's illegal promotion practices to this day.

10.     The NYPD's discriminatory promotion policy harms not only African-American detectives but all of New York City.

11.     The Named Plaintiffs thought that that by joining the NYPD they would not only help keep New York City safe but also make a difference in the primarily African-American communities where they were raised. They did not see many African-American police officers in their communities growing up and thought that by joining the NYPD they could help change their communities' perception of the police. After becoming officers, they mentored young African-American boys and tried to teach them by example that police officers are people they can rely on. And they encouraged other African Americans to join the NYPD.

12.     While the Named Plaintiffs experienced discrimination throughout their career at the NYPD, the discrimination they faced in the Intelligence Division was different. As they watched their white colleagues repeatedly get promoted over them, despite their excellent evaluations and recommendations, they came to the painful realization that their race matters more to the NYPD than their achievements or record of service. This realization left them frustrated and disheartened and unlikely to recommend that other African Americans join the NYPD.

## PARTIES

### *Named Plaintiffs*

13.     Plaintiff Sara Coleman is the wife of former NYPD Detective Theodore Coleman. Ms. Coleman resides in Florida, where she lived with her husband until his death on

May 15, 2016. On September 14, 2016, the Circuit Court for Seminole County, Florida appointed Mrs. Coleman as personal representative of the estate of Det. Coleman. Det. Coleman worked for the NYPD from June 1992 until his retirement in August 2012.

14.     Detective Jon Jason McCollum is a 24-year veteran of the NYPD. He retired in June 2016. He currently resides in New York, New York.

15.     Detective Roland Stephens is a retired NYPD detective. He joined the force in 1991 and retired in July 2017. Det. Stephens currently resides in Brooklyn, New York.

***Defendants***

16.     The City of New York (the "City") is a municipal corporation existing by virtue of the laws of the State of New York. The City, through the NYPD, maintains a policy and practice of discriminating against African-American detectives in the Intelligence Division. The City is liable for the discrimination Named Plaintiffs and similarly situated African-American detectives suffered.

17.     NYPD Deputy Commissioner David Cohen was the head of the Intelligence Division of the NYPD from approximately January 2002 until December 2013. He and Defendant NYPD Assistant Chief Thomas Galati were primarily responsible for all promotion and transfer decisions with respect to detectives in that division during that timeframe.

18.     NYPD Assistant Chief Thomas Galati is currently the commanding officer of the Intelligence Division, a role he has had since approximately October 2006. He has had the Assistant Chief title since approximately December 2008. His duties at all times relevant to this complaint include, in part, making promotional and transfer decisions in the Intelligence Division.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over Named Plaintiffs' federal claim pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §§ 2000e-5(f)(1), 5(f)(3) and supplemental jurisdiction over the state and city law claims pursuant to 28 U.S.C. § 1367.

20.     As the Southern District is the district where a substantial part of the events giving rise to the claims occurred, venue is proper within this District pursuant to 28 U.S.C. § 1391(a)(2).

21.     Named Plaintiffs filed a charge with the EEOC against the City, Deputy Commissioner Cohen, and Assistant Chief Galati on December 14, 2011, complaining of race and color discrimination as alleged in this Complaint. The charge expressly alleged that this discrimination stemmed from a policy and practice Defendants employed of not promoting African-American detectives and asked the EEOC to investigate the case "as a systemic pattern and practice case."

22.     On March 4, 2016, the EEOC issued a final determination in favor of the charging parties, concluding that there is reasonable cause to believe that the City violated Title VII individually and collectively.

23.     The EEOC concluded that "black detectives do not receive equal treatment in promotion." The Determination stated that a "[d]etailed analysis of the materials made available substantiates the conclusion that the three Charging Parties, and black detectives in general, received lesser and later opportunities for promotion consistent with their qualifications."

24.     The EEOC attempted conciliation thereafter. After conciliation failed, the EEOC referred the complaint to the United States Department of Justice ("DOJ"), which

reviewed the matter and determined not to file suit.

25.     On June 26, 2017, DOJ issued a notice stating that Named Plaintiffs had

90 days from receipt of that notice to file suit. Named Plaintiffs received the notice onJune 29,

2017.

26.     Pursuant to Section 8-502(c) of the New York City Human Rights Law,

Plaintiffs will serve a copy of the Complaint on the City of New York Commission on Human

Rights and the Corporation Counsel of the City of New York.

## JURY DEMAND

27.     Named Plaintiffs hereby demand a trial by jury in this action.

## FACTUAL ALLEGATIONS

### *General Background on NYPD Ranks*

28.     The lowest uniform rank within the NYPD is that of police officer.

29.     Any police officer who conducts investigative work for 18 months must

be promoted to a detective.

30.     A detective receives a coveted gold shield, additional training

opportunities, better assignments, and a substantial increase in compensation.

31.     Newly promoted detectives begin at the lowest grade, Third Grade

Detective, and are eligible to be promoted to Second Grade Detective, and then to First Grade

Detective.

32.     There is an enormous difference in compensation and prestige between a

Third Grade Detective, which is just one rank above police officer, and the most senior First

Grade Detective. First Grade Detectives have base compensation levels over $30,000 above

Third Grade Detectives and approximately $20,000 above Second Grade Detectives and are

eligible for a similar compensation premium in their overtime, cash payments for unused

vacation and compensation time, and retirement pensions.

33.     The difference in retirement pension money between a First and Third

Grade Detective is approximately $15,000 per year, for the life of that detective.

34.     First Grade Detectives are also provided opportunities for better training;

are invited to formal social events within the NYPD; given additional opportunities for

professional networking; and can earn significantly more in private practice upon retirement

from the NYPD than lower-ranked detectives.

35.     Promotions within detective grades are recognized as major

accomplishments, with announcements submitted to all commands within the NYPD. Each

promotion is recognized with a formal ceremony at NYPD headquarters, where the detective

appears in full dress uniform in the presence of family and friends and personally receives the

promotion from the NYPD Commissioner.

36.     Above the rank of detective are the supervisory ranks, starting with

Sergeant, then Lieutenant, Captain, Deputy Inspector, Chief up to the Commissioner.

## RACE DISCRIMINATION IN THE NYPD'S INTELLIGENCE DIVISION

### *African Americans Are Underrepresented in the Intelligence Division of the NYPD*

37.     The Intelligence Division is one of the most elite and prestigious divisions

within the NYPD. Intelligence Division detectives are known to be amongst the most talented,

hard-working, and well-respected members of the NYPD.

38.     Until 2013, the Intelligence Division was headed by Deputy

Commissioner David Cohen and Assistant Chief Thomas Galati and comprised of close to 600

employees, including approximately 280 detectives.

39.     Assistant Chief Thomas Galati remains the commanding officer of the Intelligence Division.

40.     The Division is divided into four main groups—Criminal Intelligence, Operational Analysis, Municipal Security, and Public Security—which are in turn subdivided into several units that specialize in various areas of intelligence.

41.     Only a very small percentage of African Americans are given the opportunity to transfer to the Intelligence Division.

42.     And those few African-American detectives who make it to the Intelligence Division are rarely promoted.

43.     At the time Named Plaintiffs filed the EEOC charge in 2011, African Americans constituted 18% of all NYPD police officers and 16% of all NYPD detectives, but only 6% of Intelligence Division personnel and 7% of Intelligence Division detectives. White officers, in 2011, were substantially overrepresented in the Intelligence Division, constituting 80% of the Intelligence Division and 80% of Intelligence Division detectives but 50% of all NYPD officers and 57% of all detectives.

44.     At higher levels of seniority, in 2011, there were no African Americans above the rank of Sergeant—in other words, no African American Lieutenants, Captains, or other high-level supervisory personnel—in the entire Intelligence Division.

45.     These figures improved some after Named Plaintiffs successfully challenged Defendants' discriminatory promotion practices in their EEOC charge. The NYPD has added additional African-American sergeants and two African-American lieutenants (or approximately 20 total) and promoted more African-American detectives, including three from the Enterprise Operations Unit, which is a unit where African-American detectives are

concentrated, as described below.

46.     African-American detectives, however, continue to lag behind in promotions as compared to their white counterparts.

47.     And the upper ranks of the Intelligence Division still contain no African Americans—no Captains, Deputy Inspectors, or Chiefs.

***The Intelligence Division's Secret & Unstructured Promotion Process Is Discriminatory***

48.     The NYPD professes that promotions are the result of merit alone.

49.     But the NYPD has no structured policy or procedure governing the promotions process for detectives. The only written policy the NYPD has for promotions applies to how supervising officers evaluate the detectives they are supervising. Supervising officers can recommend that a detective be promoted but they are not the ultimate decision-maker for that promotion. That responsibility rests with Assistant Chief Galati, along with Deputy Commissioner Cohen during his tenure.

50.     The NYPD does not publish when promotion decisions for Intelligence Division detectives will be made, who will participate in the decision-making process, or what weight, if any, supervisor recommendations will be given.

51.     Candidates for promotion are not told how many vacancies there are, who else they are competing against, or what criteria will be used to decide promotions. Often, they are not even informed that they are being considered for promotion.

52.     In practice, promotions are the result of a highly subjective decision-making process, with decisions about advancement made in secret by all-white high level supervisors.

53.     Race plays an impermissible role in all levels of the highly subjective

promotions process. From the beginning to end, the process of being transferred into the Intelligence Division—and succeeding within it—is opaque and works against African Americans.

54.     Assistant Chief Galati, along with Deputy Commissioner Cohen during his tenure, ultimately made all promotion and transfer decisions for the Intelligence Division.

55.     As grossly underrepresented "outsiders," Named Plaintiffs were not privy to the secret process that governs promotions. They were given no information about any criteria used for promotions, nor were they told about what they could do to maximize their chances of promotion. On occasion, they were asked by their direct supervisors to submit a written memorandum (called a UF 49 form) about their background and experiences and were told that this form would be relevant to their consideration for promotion.

56.     Named Plaintiffs were informed that supervisor evaluations play a large role in promotion decisions. All detectives in the Intelligence Division should receive written evaluations from their direct supervisors at least once a year. In each evaluation, supervisors rank detectives on various criteria from a scale of 0-5 and assess each detective on an overall score of 0-5. Supervisors also include written comments in their evaluations, including whether they recommend a candidate for promotion.

57.     While Named Plaintiffs were told that supervisor evaluations play a large role in evaluations—given that their direct supervisors are the only people who can recommend candidates based on their direct personal experience—in practice, the role of supervisory evaluations is unclear.

58.     On information and belief, the high-level supervisory personnel who ultimately make promotions decisions have unfettered discretion to disregard evaluations.

59.     Each Named Plaintiff repeatedly submitted the required UF 49 forms, received extremely positive evaluations, and was expressly recommended for promotion multiple times by multiple supervisors. But they were not promoted.

60.     At the same time, white detectives with less experience and worse evaluations were promoted. On information and belief, white detectives were frequently promoted even if they failed to submit the UF 49 forms and/or were not recommended for promotion.

61.     Named Plaintiffs were informed by multiple supervisors of the existence of a secret "list" or "grid" of candidates for promotion. They never saw this list, knew who compiled it, observed whether and how it is ranked, or had the opportunity to be evaluated or considered for it. On information and belief, white detectives who have been told that they are on the "list" have been promoted rapidly. But African-American detectives who have been told for years that they are on the "list" have not been promoted.

62.     After the Named Plaintiffs filed with the EEOC, the NYPD began working on a new promotion policy.

63.     High-level NYPD employees have admitted that a change to the promotion process is necessary. One Lieutenant testified in another case over a year ago that there is "no set policy" on detective promotions and that the process of how you get on the grid and move up on it is "mysterious." He explained that "people are frustrated about the promotion process to detective second grade in particular and first grade" and that the NYPD is "trying to come up with a way to let people know what's expected of them."

64.     On information and belief, this policy has yet to be implemented and promotions continue to be made without a structured process, set criteria, or notice to employees.

65.     As a result of the secret and standard-less promotions policy, NYPD personnel have unchecked discretion in making promotion decisions, which they employ to hand-pick white candidates for promotion while repeatedly passing up more qualified and highly recommended African-American candidates.

66.     The NYPD, Deputy Commissioner David Cohen, and Assistant Chief Thomas Galati can offer no justification for their decision to employ a standard-less, highly subjective, and secretive promotions and assignments policy. This policy is not tied to any business necessity or job-related justification; to the contrary, it undermines performance incentives and frustrates employees by giving detectives no guidelines for what they can do to improve their performance and maximize their chances of promotion.

67.     Rather than business necessity, NYPD's policy is motivated by one objective only: to enable high-level supervisors to continue to hand-pick candidates for promotion based on impermissible considerations, while at the same time, concealing the patently discriminatory dynamics at work

***African-American Detectives Are Relegated to Non-Promotional Units***

68.     The NYPD routinely places African-American detectives in less desirable units where few are promoted.

69.     Although the NYPD does not formally rank units and maintains that unit assignments play no role in promotions, in practice there are units that are informally known to be "promotional" units—meaning that detectives are regularly advanced to Second and First Grade Detective from these units—and other units known as being "non-promotional," meaning that detectives in these units are rarely, if ever, promoted.

70.     African Americans are concentrated in undesirable, non-promotional

units, while promotional units are often all-white.

71.     For instance, the Intelligence Division's Enterprise Operations Unit, informally known as the "Rap" unit, is well known for being non-promotional.

72.     When the Rap unit was formed in 2005, it had five African-American detectives and two white detectives. Those two white detectives quickly retired. From then until today, only one other white detective joined the Rap unit. That one white detective was promoted to Second Grade even though he had only two years' experience in the Intelligence Division at the time.

73.     Not a single African American detective in the Rap unit was promoted from 2008 to 2011, when the EEOC charge was filed.

74.     In 2011, when the EEOC charge was filed, there were no whites in the Rap unit and all but one member of the unit was African American.

75.     On information and belief, presently, there are no white detectives in the Rap unit and nearly all members are African American.

76.     By contrast, promotional units—some of which have multiple promotions in any given year—are often all or nearly all white. When African Americans seek to be transferred out of non-promotional units like the Rap unit, their requests are denied, while white detectives are often readily placed in the most desirable units.

77.     In addition to being placed in non-promotional units, the handful of African Americans in the Intelligence Division are discriminated against in myriad other ways, including but not limited to being denied opportunities to transfer to better units and by being given little or no additional training opportunities that would allow them to distinguish themselves and obtain better assignments.

14

78.     On information and belief, the NYPD has no policy governing when or how assignments to a particular unit or training opportunities will be made. Instead, these decisions are left to the unfettered discretion of nearly all white supervisory personnel within the Intelligence Division.

## THE INDIVIDUAL NAMED PLAINTIFFS' EXPERIENCE

### Plaintiff Det. Jon McCollum

79.     Det. McCollum served the NYPD for over 24 years from 1992 until July 2016 when he retired.

80.     He became a Third Grade Detective in 1996 and joined the Intelligence Division in March 2001.

81.     At the time Det. McCollum joined the Intelligence Division its function was to assist intelligence gathering throughout New York City. On September 11, 2011, Det. McCollum was in Harlem when the first plane hit. He rushed downtown and was downtown when the second plane hit. He was in Tower 7 soon before it came down and assisted in the rescue and recovery efforts.

82.     After 9/11, the Intelligence Division's focus shifted to fighting terrorism. Det. McCollum conducted hundreds of terrorism investigations, interviewing suspects, signing up confidential informants, and coordinating these efforts with other divisions of the NYPD and with the federal government.

83.     Despite this work, he was not promoted to Second Grade Detective until 2012, after he filed this EEOC charge, despite explicit, repeated recommendations by supervisors beginning almost a decade earlier that he be promoted.

84.     In the 16 years Det. McCollum remained a Third Grade Detective, he

witnessed the promotion to First Grade Detective of virtually every other non-African-American detective who began with him in 1996. He watched as many white detectives in his class were promoted to Second Grade Detective after just a few years.

85.     Det. McCollum's repeated failure to advance stands in stark contrast to the recommendations and outstanding evaluations he received over the course of his career. He consistently received written supervisory evaluations rating him 4.5 out of 5 and several commendations, including 35 departmental recognitions for Excellent Police Duties.

86.     Det. McCollum was promised promotions because of his outstanding performance repeatedly. In 2001, Det. McCollum was told that if he continued with his excellent work, he could expect to "retire as a First Grade Detective." But over the next several years, Det. McCollum witnessed several white detectives who were junior to him be promoted—including detectives he helped train—while he was repeatedly ignored. Det. McCollum never received any explanation for his repeated denials of promotion, even though he was recommended for promotion several times.

87.     For instance, in February 2004—after Det. McCollum had been a Third Grade Detective for eight years—he was informed by a supervisor that due to his excellent investigative work in a double homicide, he would be promoted to Second Grade Detective. But Det. McCollum never received the promotion, or any explanation for the denial.

88.     In October 2006, Det. McCollum was again expressly promised a promotion by a different supervisor, who informed him that a large number of promotions were about to occur and that he was at the "top" of the secret "list" based on his seniority and achievements. But once again, Det. McCollum was not promoted—although a large number of promotions did occur, and a number of white officers with less experience and achievement were

promoted above him.

89.    In May 2007, a third supervisor submitted an excellent evaluation for Det. McCollum and explicitly recommended him for promotion, stating that Det. McCollum "should be considered [for promotion] until the promotion is granted." Once again, Det. McCollum's supervisor's recommendation for promotion was ignored, and Det. McCollum was given no explanation.

90.    In May 2008, his supervisor again submitted another excellent evaluation for Det. McCollum, stating "Det. McCollum is the most senior detective in the unit and sets an example for the others. In this rater's opinion, Det. McCollum should be considered for promotion due to his service, diligence, and devotion to the Intelligence Division for over seven years." Based on the strength of his recommendation, Det. McCollum's supervisor informed him that he would be promoted. But once again, Det. McCollum was passed up for promotion.

91.    Throughout this time, other detectives, including supervisors, commented that the situation was unfair and apologized to him for what appeared to be blatant discrimination in the promotions process. One supervisor told him "if you were a white guy, you'd be First Grade by now," or words to that effect.

92.    For the next several years, Det. McCollum continued to be repeatedly recommended for promotion, assured by his supervisors that he was on the secret "list" for promotion and explicitly informed that he would be promoted. But he was never promoted.

93.    In February 2011, another one of Det. McCollum's supervisors asked Det. McCollum to update his UF 49 so he could recommend Det. McCollum for promotion once again. This supervisor—at least the fourth direct supervisor to submit a written request for Det. McCollum's promotion—told Det. McCollum that to ensure his promotion, he was submitting

Det. McCollum's UF 49 with only one other inexperienced candidate who had less than half as much experience as Det. McCollum. Det. McCollum's supervisor also advised that detective that he was being put forward against Det. McCollum and that Det. McCollum would receive the promotion, given his superior record and experience.

94.     In May 2011, however, Det. McCollum was again denied promotion, while that less experienced detective was promoted above him. After the promotions were announced, both the newly-promoted detective and his supervisor apologized to Det. McCollum, acknowledging that the promotion did not reflect merit. Det. McCollum's supervisor also said that he had no explanation for the promotion.

95.     For the May 2010 to May 2011 period, Det. McCollum received another outstanding evaluation. His supervisor recommended once again that Det. McCollum be promoted, stating "Det. McCollum is a highly regarded member of the Department and the quality of his work and level of commitment are such that I recommend that he be promoted to Detective, Second Grade." But despite this strong recommendation, Det. McCollum was not promoted.

96.     Shortly after he was denied promotion, in and around May 2011, Det. McCollum approached the union representative and told him that there appeared to be discrimination against African Americans in the Intelligence Division. The union representative initially responded that this was not a "union" issue but said that he would inform Assistant Chief Thomas Galati that African-American detectives felt they were unfairly being denied promotion.

97.     About one month later, Det. McCollum learned that Assistant Chief Galati had informed the union representative that "they'd get one guy." Det. McCollum understood this

to mean that, in response to his complaint about discrimination, high level supervisors had

decided to pick one African-American detective for promotion. He was also informed that the

"one African American guy" the NYPD had selected for advancement was Det. Theodore

Coleman, who was on the verge of retirement.

98.     The NYPD's response to Det. McCollum's discrimination complaint—

namely, its decision to keep in place an opaque and standard-less promotion policy and to

arbitrarily select an African American on the cusp of retirement for promotion—sent the clear

signal that the NYPD had no interest in choosing candidates for promotion on the basis of merit;

rather, its chief concern was with preserving a secretive system that allowed high-ranked

supervisors to make racially motivated promotions decisions with impunity.

99.     Det. McCollum was eventually promoted in 2012, a year after the EEOC

charge and two years before his retirement.

100.    Det. McCollum's white colleagues promoted along with him averaged

approximately five years before their promotion. African-American colleagues that were

promoted at the same time have averaged nearly ten years, and Det. McCollum waited 16 years.

***Plaintiff Det. Theodore Coleman***

101.    Det. Coleman dedicated twenty years of his life to the NYPD. He joined

the NYPD in 1992, was assigned to the Intelligence Division as a police officer in March 2001,

and was promoted to Third Grade Detective on October 26, 2001.

102.    For nearly a decade, Det. Coleman remained a Third Grade Detective,

despite his many commendations and recommendations for promotion.

103.    During the course of his career, Det. Coleman was recommended for

promotion many times, but the recommendations of his supervisors were ignored.

104.    For instance, in March 2005, four years after he became a Third Grade Detective, Det. Coleman's supervisor explicitly recommended him for promotion. But instead of being promoted, Det. Coleman was transferred to a different unit, ostensibly on the grounds that his expertise was needed in training new personnel.

105.    The following year, in October 2006, Det. Coleman was informed, as Det. McCollum had been, that a large number of promotions were going to take place that year and that he was on the secret "list" based on his seniority and achievement. But once again, Det. Coleman was not promoted—although a large number of promotions did occur, and a number of white officers with less experience and achievement were promoted above him. When Det. Coleman asked a senior supervisor to explain the promotions process and the criteria for promotion, the supervisor could not give him an answer and said promotions were decided by the "front office" and were not in his control.

106.    Every year for the next six years, Det. Coleman continued to be told by multiple supervisors that he had been recommended for promotion, was on the secret promotion "list," and would be promoted. But he never had the opportunity to review the "list," see where he ranked on it, or discuss his qualifications with the unnamed supervisory personnel who ultimately made promotion decisions.

107.    Year after year, Det. Coleman was passed up for promotion, while white detectives with less experience and lower evaluations were advanced above him. Many of the white detectives he trained were promoted over him.

108.    Det. Coleman's failure to be promoted was not the result of lack of merit. At least two supervisors told him he would have been promoted had he been white.

109.    He also received outstanding evaluations including written scores of 4.5

out of 5, on his evaluations from 2008 through 2011 when the EEOC charge was filed. In multiple evaluations, his supervisors explicitly stated that he was recommended for promotion to Second Grade Detective and commented on his seniority within the Division. In his February 22, 2011 evaluation, Det. Coleman's supervisor noted that Det. Coleman had previously been recommended for promotion and once again strongly recommended him for promotion. In spite of this recommendation, Det. Coleman's promotion was denied.

110.    Just months later, in or about June 2011, after Det. McCollum complained to the union representative about discrimination, the union representative informed him that Assistant Chief Galati had been made aware of the belief that African Americans were subject to discrimination in the Intelligence Division, and that in response, had decided to "give them one guy." Det. Coleman understood this meant that in response to the complaint about discrimination, the NYPD had picked one African American to promote. Det. Coleman was informed that he would be the "one guy" who would be promoted.

111.    On August 25, 2011, after approximately 19 years in the NYPD, and just months away from his retirement at 20 years, Det. Coleman was promoted to Detective Second Grade.

112.    Det. Coleman was one of the last detectives in his entering Intelligence Division class to be promoted. Det. Coleman understood, however, that his promotion was not the result of his excellent evaluations, given that just six months earlier, he had been denied a promotion despite his supervisor's recommendation. Rather, he understood that his long-delayed promotion was a cynical attempt by the NYPD to appease all African-American detectives and stave off any further challenges to the persistent racial inequalities within the Intelligence Division.

113.    The white colleagues promoted along with Det. Coleman averaged about four years before promotion, while his African-American colleagues that were promoted at the same time averaged six years. Det. Coleman personally waited ten years before being promoted.

114.    As a result of his delayed promotion, Det. Coleman had to delay his plans to retire in June 2012 for two extra months to realize the full benefit to his pension.

*Plaintiff Det. Roland Stephens*

115.    Det. Stephens joined the NYPD in 1991 and retired in July 2017 after over twenty-five years. Det. Stephens was promoted to Third Grade Detective in 1999, and joined the Intelligence Division in 2001. He remained a Third Grade Detective for over 13 years, receiving a promotion to Second Grade Detective in 2013, only after this EEOC charge was filed.

116.    During his time as a detective, Det. Stephens consistently received outstanding evaluations. For years, he received scores of 4.5 out of 5 in his supervisory assessments, and in 2010, he received an exceedingly rare perfect 5 evaluation.

117.    Det. Stephens has repeatedly been recommended for promotion by his supervisors. In his 2010 evaluation, for instance, Det. Stephens' supervisor noted that Det. Stephens was the senior investigator in his unit, had been a part of the unit "since the beginning," and "highly recommend[ed] [him] for promotion to Second Grade." He again "highly recommend[ed]" Det. Stephens for promotion the following year.

118.    Despite his outstanding evaluations and recommendations for promotion, Det. Stephens was repeatedly denied promotion, while less qualified and experienced white detectives were promoted above him. Although Det. Stephens was never given an explanation for his failure to be promoted, his denial of promotion appeared to be linked to his placement in the virtually all-African American "Rap" unit.

119.    Det. Stephens was assigned to the Rap unit in 2005 and remained there until his retirement in July 2017. On information and belief, during that time, only one white detective was placed in this unit and that detective was the only promotion out of that unit from approximately 2008 until the EEOC charge was filed. As of 2016, the unit had no white detectives. Meanwhile, promotional units—staffed with predominately white detectives and, in many cases, no African-American detectives—regularly have multiple promotions per year.

120.    Beginning in 2010, Det. Stephens repeatedly asked his supervisor for an explanation for his failure to be promoted. While his supervisor assured Det. Stephens that he would try to push for Det. Stephens's promotion, he was ultimately unable to offer any explanation for why Det. Stephens had not already been promoted or to predict when Det. Stephens might be promoted. Another supervisor told Det. Stephens, "you know if you were white, you would be promoted," or words to that effect.

121.    Det. Stephens was finally promoted to Second Grade Detective in 2013. The white colleagues promoted along with Det. Stephens averaged about six years before promotion, while he and his African-American colleagues averaged twelve years.

## CLASS ACTION ALLEGATIONS

122.    Named Plaintiffs bring all claims in this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of:

> All African-American detectives of the NYPD Intelligence Division who, as of December 14, 2008 or later, were not promoted or whose promotions were delayed based on race (collectively the "Rule 23 Class").

123.    The Rule 23 Class is so numerous that joinder of all members is impracticable. The exact number of the Rule 23 Class members is unknown to Named Plaintiffs at this time, but it is believed to be more than twenty. For purposes of notice and other purposes

related to this action, the identities and addresses of the Rule 23 Class members are known to Defendants and are readily available in their employment records.

124.     The Named Plaintiffs' claims are typical of the claims of the other members of the Rule 23 Class. The Named Plaintiffs and all other members of the Rule 23 Class sustained damages arising out of Defendants' conduct in violation of Title VII and state and city human rights laws. The Rule 23 Class members are employed, or were employed, by the NYPD as detectives and were improperly denied promotions. They enjoy the same statutory rights and protections, and have sustained similar types of damages as a result of Defendants' illegal conduct under Title VII and state and city human rights laws.

125.     The Named Plaintiffs will fairly and adequately protect the interests of the members of the Rule 23 Class and have retained counsel competent and experienced in complex class action litigation, including suits involving employment discrimination.

126.     The Named Plaintiffs do not have interests that are contrary to or in conflict with those of the other members of the Rule 23 Class.

127.     The Named Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

128.     Common questions of law and fact exist as to all members of the Rule 23 Class and predominate over any questions affecting solely individual members. Among the questions of law and fact common to the Rule 23 Class are:

(a)     Whether Defendants have employed a discriminatory policy and practice of denying African-American detectives promotions based on race;

(b)     Whether Defendants had a standard-less and secretive process that allowed the all-white supervisors to refuse to promote deserving African-American detectives;

24

(c)     Whether Defendants violated Title VII and state and city human rights laws as alleged herein by intentionally discriminating against Named Plaintiffs and the Rule 23 Class; and

(d)     Whether Defendants violated Title VII and state and city human rights laws as alleged herein by implementing a discriminatory policy and practice that had the effect of discriminating against Named Plaintiffs and the Rule 23 Class.

129.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Although the relative damages suffered by individual Rule 23 Class members are not *de minimis,* such damages are small compared to the expense and burden of individual prosecution of this litigation. Class litigation is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments regarding Defendants' discriminatory promotion practices. Important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of court and public resources. Treating the claims as a class action would result in a significant savings of these costs. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

130.    A class action will also allow for the redress of harm to employees who are unwilling or unable to affirmatively bring or opt into a lawsuit. Current and former employees are often afraid to assert their rights out of fear of direct or indirect retaliation because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the complaint a degree of anonymity that allows for the vindication of their rights while eliminating or reducing these

risks.

131.    This factor is particularly important here given the culture of the NYPD. Numerous African-American detectives in the Intelligence Division have told Named Plaintiffs and others that they are afraid to make claims in their names because the NYPD's culture is vindictive and retaliatory.

### DAMAGES:
### The Effect of the Discrimination on Named Plaintiffs and Other African-American Detectives

132.    For years, Named Plaintiffs attempted to ignore the discriminatory dynamics within the Intelligence Division. They believed that if they simply continued to excel and receive outstanding evaluations, their accomplishments would eventually be recognized. But after years of being passed up for promotions while less qualified white detectives were advanced above them, Named Plaintiffs have been forced to come to the painful realization that their race matters more to the NYPD than their achievements or records of service. Every time Named Plaintiffs were passed up for desirable assignments, denied transfers into desirable units, given low-visibility positions, and ultimately denied the rank and prestige that comes with promotions, they paid a price.

133.    Named Plaintiffs suffered a powerful emotional toll. Named Plaintiffs devoted the bulk of their careers to the Intelligence Division; they took enormous pride in their work and in wearing the gold shield of detective. But after giving their heart and soul to the NYPD, they have been forced to acknowledge the humiliating and degrading reality that ultimately, their records of achievement and lengthy years of service mattered less to the NYPD than the color of their skin. Named Plaintiffs were embarrassed to still be Third Grade Detectives after so many years on the force. They feared that others thought they had done something seriously wrong that made them ineligible for promotion.

134.    Det. Coleman retired after 20 years on the force because he could no longer handle the discriminatory treatment. He joined the NYPD to make a difference in his lower-income African-American community. He mentored numerous young African Americans and tried to make a connection with those he served. Det. Coleman's initial love of the job turned to disappointment and embarrassment when he realized that his hard work would not be recognized because of his race. Det. Coleman decided to bring this EEOC charge on the verge of retirement to help those who would come behind him in the NYPD. He spoke to over ten Intelligence Division detectives who felt they were discriminated against based on race.  Only Det. McCollum and Det. Stephens, however, were ultimately willing to join the case because others feared retaliation from the NYPD. Before he died in 2016 from cancer, Det. Coleman said that he "hoped it was not all for nothing" and that the NYPD would change.

135.    The monetary loss that Named Plaintiffs and other African-American detectives suffered is great. They lost tens of thousands of dollars each year they were not promoted and now have significantly smaller pensions. According to the EEOC's analysis, absent discrimination, Det. McCollum and Det. Coleman would have been promoted to Second Grade Detective in 2006 and to First Grade Detective by 2010. Det. Stephens should have been promoted to Second Grade Detective in 2008 and to First Grade Detective in 2012. That is, they should have been First Grade Detective before the NYPD promoted them to Second. Named Plaintiffs therefore lost hundreds of thousands of dollars due to discrimination by the NYPD.

There is also a stark and unjustifiable under-representation of African Americans in the Intelligence Division. The pervasively discriminatory environment in which Named Plaintiffs and others were forced to work has caused them substantial harm and will continue to harm all other African-American members of the NYPD Intelligence Division who are never

given the opportunity to advance within it.

## FIRST CAUSE OF ACTION
Unlawful Discrimination—Title VII, 42 U.S.C. § 2000e *et seq.*
Against the City

136.    Named Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

137.    Defendant City is an employer as defined in Title VII, and at all relevant times herein, employed Named Plaintiffs and Rule 23 Class members.

138.    Defendant City, in violation of 42 U.S.C. § 2000-e2(a), discriminated against Named Plaintiffs and Rule 23 Class members based on race and color by denying them promotions and therefore giving them less pay and rank as compared to less qualified white detectives.

139.    This discrimination was a result of intentional actions by Defendants, deliberate indifference by Defendants, and/or the result of Defendants maintaining a policy or practice that has a disparate impact on African-American detectives, namely a standard-less and secretive process that allowed the all-white supervisors to refuse to promote deserving African-American detectives.

140.    As a result of Defendant City's discrimination, Named Plaintiffs and Rule 23 Class members suffered and continue to suffer damages, including but not limited to lost income, and mental anguish, pain and suffering. They are also entitled to attorney's fees and costs.

## SECOND CAUSE OF ACTION
Unlawful Discrimination—N.Y. Executive Law §§ 290 *et seq.*
Against the City

141.    Named Plaintiffs repeat and reallege the above paragraphs as if fully set

forth herein.

142.    The acts described above constitute unlawful discriminatory employment practices that violate Section 296 of the New York Executive Law.

143.    Defendant City discriminated against Named Plaintiffs and Rule 23 Class members by failing to promote them due to their race.

144.    This discrimination was a result of intentional actions by Defendants, deliberate indifference by Defendants, and/or the result of Defendants maintaining a policy or practice that has a disparate impact on African-American detectives, namely a standard-less and secretive process that allowed the all-white supervisors to refuse to promote deserving African-American detectives.

145.    As a result of Defendants' discrimination, Named Plaintiffs and Rule 23 Class members have been damaged and are entitled to compensatory damages, and attorneys' fees and costs.

### THIRD CAUSE OF ACTION
Unlawful Discrimination—N.Y.C. Admin. Code §§ 8-101 *et seq.*
Against All Defendants

146.    Named Plaintiffs repeat and reallege the above paragraphs as if fully set forth herein.

147.    The New York City Administrative Code is explicit that the City Human Rights Law "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof" and that exceptions and exemptions "be construed narrowly in order to maximize the deterrence of discriminatory conduct." N.Y.C. Admin. Code § 8-130(a)-(b).

148.    The acts described above constitute unlawful discriminatory employment practices that violate Section 8-107 of the New York City Administrative Code.

149.    All Defendants unlawfully discriminated against Named Plaintiffs and Rule 23 Class members by denying them promotions due to their race and therefore giving them less pay and rank as compared to less qualified white detectives.

150.    This discrimination was a result of intentional actions by Defendants, deliberate indifference by Defendants, and/or the result of Defendants maintaining a policy or practice that has a disparate impact on African-American detectives, namely a standard-less and secretive process that allowed the all-white supervisors to refuse to promote deserving African-American detectives.

151.    As a result of Defendants' discrimination, Named Plaintiffs and Rule 23 Class members have been damaged and are entitled to compensatory damages, punitive damages, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Named Plaintiffs request the following relief against Defendants as follows:

1.    An order certifying this case as a class action under Fed. R. Civ. P. 23;

2.    A judgment declaring that Defendants have committed the violations of law alleged in this action;

3.    An order enjoining the City to retroactively promote the Named Plaintiffs and Rule 23 Class members to Second Grade and First Grade detectives and to provide them the associated back pay and associated benefits, including increased pension benefits;

4.    Actual or compensatory damages against all Defendants in an amount to be proven at trial;

5.      Punitive damages against Defendants Deputy Commissioner Cohen and

Assistant Chief Galati in an amount to be determined;

6.      Reasonable attorneys' fees and costs; and

7.      Such other and further relief as the Court may deem just and proper.

Dated: September 25, 2017
       New York, New York

                              EMERY CELLI BRINCKERHOFF
                              & ABADY LLP

                              By:___/s/ Elizabeth Saylor_____
                                        Elizabeth S. Saylor
                                        Jessica Clarke
                                        Earl S. Ward
                                        600 Fifth Avenue, 10th Floor
                                        New York, NY 10020
                                        (212) 763-5026

                              *Counsel for Plaintiffs*

                              NEW YORK CIVIL LIBERTIES UNION
                              FOUNDATION
                                        Christopher Dunn
                                        125 Broad Street
                                        New York, NY 10004
                                        (212) 607-3300

                              *Of Counsel*